| ^THOMAS F. DALEY, Judge.
The plaintiffs, Rosario J. Mancuso, Steven J. Mancuso, and Terry A. Mancuso, have appealed the trial court’s judgment dismissing their claims. For the reasons that follow, we affirm.
FACTS:
On February 25, 1999, Rosario Mancuso was driving his 1989 Toyota Cressida when he was rear-ended by a car driven by William Poole (Poole) and owned by Sherry Fredley (Fredley). Steven and Terry Mancuso were passengers in Rosario’s car. Neither Poole nor Fredley maintained liability insurance at the time of the accident. Plaintiffs filed suit against Allstate Insurance Company (Allstate), Rosario’s uninsured motorist carrier, for personal injuries sustained in the accident. Following trial, the trial court rendered judgment in favor of Allstate and against plaintiffs, dismissing their claims with prejudice.
At trial, Rosario testified that he previously worked for New Orleans Public Ser *156 vice when he was injured in an at work accident. He returned to work after this 1 ^accident, only to develop Guillain-Barre Syndrome, an autoimmune process that attacks the nerves. Initially, he was very ill and on a ventilator, but the illness improved such that he recovered, but was left with nerve damage in his legs. He had not worked since the development of this syndrome. He was treated for this illness by a neurologist, Dr. Maria Palmer. He testified that he stopped seeing Dr. Palmer in 1997 because the pain in his legs had stopped.
Rosario Mancuso testified that he had been in an auto accident in 1997 and that he was treated by Dr. Richard Meyer for a back sprain. He explained that he was discharged from Dr. Meyer’s care four to six months prior to the February 1999 accident.
He testified that the February 1999 accident occurred as he was stopped on Interstate 10 and was struck from behind. He explained that his car was pushed four to six feet by the impact. Rosario testified that there was no visible damage to his car after this accident, but it was later discovered that the brackets holding the bumper to the car were damaged. These brackets were changed by his son, Steven, who is a certified mechanic.
Following the accident, Rosario Mancu-so sought treatment from a chiropractor, Dr. Richard Hages, who preformed treatments on his back. His condition did not improve, so Dr. Hages referred him to a neurosurgeon, Dr. Bradley Bartholomew, who performed steroid injections in his back in an attempt to relieve his pain. These injections offered some relief, but he also sought treatment from Dr. Palmer for his back pain.
Rosario Mancuso testified that he continues to have pain in his back and down his legs. He remains under the care of Dr. Maria Palmer. Prior to this accident he testified he was not taking pain medication, but is now taking Vicodin and Cele-brex.
| ¿On cross-examination, Rosario Mancu-so admitted that in his pre-trial deposition, he testified that he had had no back pain for one year prior to this accident. It was brought out that this was in conflict with his testimony on direct examination that he had been treated by Dr. Richard Meyer for back pain up until late 1998.
The records and deposition of Dr. Palmer were admitted into evidence. These corroborate that Rosario Mancuso was treated by Dr. Palmer for Guillain Barre Syndrome in the 1980’s and his last visit with Dr. Palmer prior to the February 1999 accident was in 1997. In her deposition, Dr. Palmer explained that Rosario had suffered a severe case of Guillain-Barre syndrome that left him with permanent nerve damage in his legs. This nerve damage manifested itself by intermittent leg pain that had improved over the years. She explained that the nerve pain was worse with stress or weather changes. Rosario then developed arthritis in the back. She explained that an MRI performed in April 1996 showed degenerative changes in the lumbar spine and Dr. Palmer diagnosed Rosario as having moderately advanced chronic hypertrophic facet joint degenerative changes.
Dr. Palmer testified that Rosario Man-cuso presented to her office in September 1999 complaining of back pain from an accident that occurred in February of that year. His pain started on the top of his iliac crest and radiated to his thighs. Dr. Palmer explained that this pain could be due to the accident, or it could have been caused by a tight belt. She did not know the cause of that pain. She further testified that the pain in Rosario’s legs after *157 the February 1999 accident was caused by the residual nerve damage from the Guil-lain-Barre Syndrome rather than a back injury sustained in the accident. She disagreed with Dr. Bartholomew’s report stating the pain was coming from his back stating that Dr. Bartholomew was not aware of the severity of the Guillain-Barre.
15Pr. Palmer concluded that Rosario Mancuso had similar pain prior to the accident, but it was worse following the accident. Dr. Palmer opined that the accident may have aggravated or caused a flare up of pain, but Rosario had similar pain prior to the accident. She stated that the accident did not cause more damage to the nerves, but it lowered his threshold for pain because of the stress of the back pain. She was unable to state if the back pain would ever go away since it was two years post accident and he was still experiencing pain.
The medical records and deposition testimony of Dr. Richard Meyer were admitted into evidence. This evidence indicates that Dr. Meyer treated Rosario for a lumbar strain sustained in a motor vehicle accident on October 30, 1997. Rosario complained of low back pain with bilateral buttock pain and occasional leg pain throughout 1998. Dr. Meyer noted that Rosario’s leg pain pre-existed the 1997 accident and was a result of the Guillain-Barre. X-rays showed degenerative changes in the lower back. Dr. Meyer’s diagnosis was lumbar strain and degenerative disc disease. Dr. Meyer treated Rosario for these injuries until October 1998. The medical records for the last visit on October 27, 1998 state that Rosario had no leg pain.
Medical records from Dr. Hages, a chiropractor, indicate that Rosario was treated from March 1999 through April 2001 for “acute traumatic lumbar sprain/strain aggravated by hyperlordosis and facet imbrication complicated by degenerative joint disease and Guillará Barre syndrome neu-ropathy.”
Medical records from Dr. Bradley Bartholomew, a neurosurgeon, indicate that epidural steroid injections were administered in the summer of 1999 for low back pain extending into both legs. The records indicate that Rosario Mancuso experienced some relief from the injections.
Steven Mancuso (Steven) testified that he was a passenger in his father’s car at the time of the February 25,1999 accident. He explained that they were stopped | fion the interstate when they were struck from behind. He testified that it was a “solid hit” that moved the car forward three to four feet. He felt something pop in his back.
Steven testified that the bumper on the car that hit them was “hanging off.” He explained that the damage to his father’s car was to the brackets holding the bumper and this damage was only visible from underneath the car. He described the brackets as being “crushed.” He changed the brackets because he always performed maintenance and repairs on his father’s automobiles.
Steven testified that he had been disabled since an accident that occurred in 1995. The 1995 accident left him with three ruptured lumbar disc. He explained that surgery had been recommended, however, he chose not to have surgery, but to control his pain with medication. He had been treated by Dr. Jeffrey Sketchier and Dr. Daniel Seltzer. Steven explained that prior to the 1999 accident, he had pain on the right side that radiated from his back. Following the 1999 accident, he began to experience left sided pain. Steven explained that just after the accident the pain was more severe, but as time has *158 gone by the pain gets better. He now takes Darvon, Naproxen, and Desyrel to control the pain. When questioned about his activities, Steven acknowledged that he goes shrimping four to five times per year, but denied being a commercial shrimper. He explained that he brings others along to lift the trawling nets.
On cross-examination, Steven testified that prior to the 1999 accident, he experienced daily pain, but it did not keep him from doing things. It was brought out that at his deposition he testified that his pain prior to the 1999 accident was moderate to severe. He was also impeached by deposition testimony in which he stated that prior to the accident he had left leg pain and now had right leg pain. It was also brought out in cross examination that Dr. Sketchler’s records showed that throughout 1998, Steven received monthly prescriptions for Darvon and [ 7complained of chronic back pain. This continued into 1999. Steven testified that he began to visit Dr. Seltzer because his wife went to Dr. Seltzer. He admitted that he did not tell Dr. Seltzer that he was seeing Dr. Sketchier because Dr. Seltzer would not have given him pain medication.
The office records of Dr. Sketchier were admitted into evidence. These records indicate that Steven first sought treatment from Dr. Sketchier in September 1995 for complaints of low back pain. An MRI performed in November 1995 showed two ruptured discs. He was referred to a neurosurgeon, who recommended surgery, but the records indicate Steven elected to treat his pain with medication. The records indicate that he had chronic back pain with radiation into his left leg. He received monthly prescriptions for narcotic pain relievers throughout 1996, 1997, and 1998. On January 15, 1999, the record indicates that Steven continued to complain of chronic back pain radiating into his left leg and was being treated with Darvon and Naprosyn. He did . not return to Dr. Sketchier until June 7, 1999 and there is no mention of the February 1999 accident in that visit. The record indicates that his back had been “acting up” since last week, which was the beginning of trawling season. He was given an injection for the pain. He returned to Dr. Sketchier on September 17, 1999, February 14, 2000, and July 31, 2000 with continued complaints of low back pain radiating into his left leg.
The office records and deposition of Dr. Daniel Seltzer were also admitted into evidence. Dr. Seltzer’s records indicate that Steven first visited Dr. Seltzer on May 4, 1998 for pain management. Dr. Seltzer noted Steven had multilevel disc herniation with some nerve impingement. Dr. Seltzer treated Steven with Desyrel, Darvon, and Naprosyn. On February 12, 1999, Dr. Seltzer’s records indicate that Steven complained of discomfort in his back. He had decreased range of motion, but no spasms. The records indicate that Steven returned to Dr. Seltzer’s office on March 3, 1999 with complaints of increased back pain radiating into his left hip |sand thigh. The record notes that he has had a change in both the location and severity of his pain. An MRI was performed that did not show any new changes.
In his deposition, Dr. Seltzer testified that he was comfortable treating Steven without surgery as long as Steven did not “deteriorate neurologically.” In going over his office records, Dr. Seltzer noted that Steven was a “commercial shrimper”. Dr. Seltzer testified that Steven returned to him on a monthly basis throughout 1999 complaining of back pain with occasional spasms. He had good days and bad days. By October 27, 1999, Dr. Seltzer testified that Steven had stabilized and continued on “routine medications.” Dr. Seltzer tes *159 tified that Steven continued to return to his office on a monthly basis throughout 2000 and continued to complain of back pain that was related to increased activity. The pain was controlled by medication. Dr. Seltzer testified that the June 2000 visit indicates that Steven was trawling again. Dr. Seltzer explained that Steven told him he takes younger people along so that Steven did “supervisory work.” Dr. Seltzer felt that the waves moving the boat were the discomforting factor of trawling for Steven. Another MRI was performed in January 2001. There was no significant change.
Dr. Seltzer concluded that Steven believed that his back condition deteriorated as a result of the 1999 accident, but this was not substantiated on any tests that were performed. After the 1999 accident, Steven continued to complain of back pain, but the difference was that pain was referred to his left leg and hip. He testified that Steven did require an increase in the dosage of his medications after the 1999 accident. Dr. Seltzer testified that Steven’s complaints were consistent with his physical examination.
Terry Mancuso (Terry), Steven’s wife, testified that she was on disability at the time of the 1999 accident. She had been injured in July of 1989 when a ramp at a dump site where she was working collapsed, injuring her back. She testified that she had nerve damage that caused continual pain. She was initially treated by |aDr. Riehlman, who became ill and referred her to Dr. Daniel Seltzer. She had been under Dr. Seltzer’s care since 1992. In 1996 she slipped and fell sustaining an injury to her knee that required surgery. After the 1999 accident, she was involved in another accident that resulted in a neck injury that required surgery.
Terry explained that there was a moderate impact in the 1999 accident that pushed their vehicle forward. She testified that the 1999 accident caused an increase in her back pain. She described her pre-accident pain as a 7 (on a scale of 1 to 10) and testified that the accident caused her pain to increase to a 9. At the time of trial, her pain level was back to 7. Terry testified that her injury from the 1999 accident lasted until about March 2002. ■ Prior to and following the 1999 accident she took Darvon and Desoryl for pain. The dosages were increased for a period of time following the 1999 accident.
The office records and deposition of Dr. Seltzer were admitted into evidence. Dr. Seltzer testified that he began treating Terry in October 1992 for back pain. He explained that she has no definite disc herniation, but she does have some degree of degenerative changes. Dr. Seltzer testified that Terry had chronic pain in her back during 1996 and 1997. In 1997 she injured her knee, which resulted in surgery. When she recovered from the knee, she continued to complain of back pain. He noted one visit in September 1998 in which Terry complained of unbearable pain. A repeat MRI was performed that showed two small bulges and degenerative changes. Physical examination showed spasms at times. Dr. Seltzer testified that in January of 1999 Terry had had a “couple of bad weeks”, which they thought was from the cold weather. On February 12, 1999 he examined Terry and noted that she had good days and bad days and “she appeared to be returning to baseline level.” Terry returned to his office on March 11,1999 and stated that she had been in an accident in February. She complained of increased low back pain with radiation into her left hip and thigh. She had decreased range of motion |inand spasm. Dr. Seltzer testified that Terry continued to have increased pain in April, May, and June. He testified that she clearly had increased *160 pain following the accident, but by June and July she was starting to get back to her pre-accident level of pain and that by the fall of 1999 there was no difference in her pain. Dr. Seltzer then stated that only the patient can state when they returned to baseline pain level. He stated that Terry’s perception of the aggravation probably lasted through 2000 and into 2001. He opined, based in his physical exam, that her aggravation of her preexisting condition lasted 10 months. Dr. Seltzer testified that throughout 2000 -Terry had the same complaints she had before the 1999 accident.
The only witness called by Allstate was Sherry Fredley, who testified that she owned the vehicle that struck the plaintiffs. She estimated that at the time of the impact, they were traveling 8 miles per hour. Ms. Fredley testified that her vehicle was not damaged in this accident.
At the conclusion of trial the trial judge took the matter under advisement. He then rendered judgment in favor of Allstate and against plaintiffs. In his reasons for judgment, the trial judge stated that the testimony and evidence establish that the plaintiffs are not credible witnesses. DISCUSSION:
On appeal, the plaintiffs argue that the trial judge erred in ruling in favor of Allstate when the unrefuted medical evidence introduced at trial proved that the accident did in fact cause plaintiffs’ injuries. Plaintiffs contend that Allstate introduced no evidence whatsoever to contradict the medical testimony and evidence offered by plaintiffs. Plaintiffs conclude that in the absence of any medical testimony to the contrary, the trial court was clearly wrong and manifestly ^erroneous for finding the plaintiffs were not injured in the February 25,1999 accident.
Allstate responds that the trial judge based his decision on both the inconsistent testimony of plaintiffs and the medical evidence that showed no objective evidence of injury. Allstate contends that any opinion regarding aggravation of the plaintiffs’ pre-existing condition was based on plaintiffs’ statements rather than a change in their physical condition.
A review of the testimony and evidence submitted in this case reveals many inconsistencies. Both Rosario and Steven Man-cuso testified that the front bumper of the vehicle that hit them was damaged in this accident, whereas the owner of that vehicle, Ms. Fredley, testified that her vehicle was not damaged in the accident. The police report indicates there was no damage to either vehicle. Rosario Mancuso testified in his deposition that he had no back pain during the year prior to this accident, while at trial he acknowledged that he was under the care of an orthopedist, Dr. Meyer, for back pain until four to six months prior to this accident. Dr. Meyer’s office records indicate that Rosario was treated for back pain from November 1997 until October 1998. Additionally, the medical records of Dr. Palmer who treated Rosario for years prior to this accident, indicate that when Rosario went to Dr. Palmer in 1999 following this accident, he told her he had not been under the care of any physicians since 1997. Moreover, Dr. Palmer explained that the pain in Rosario’s legs was due to nerve damage as a result of an earlier illness.
Steven Mancuso’s testimony was also impeached by inconsistencies. At trial, Steven testified that prior to this accident, his pain was going away to the extent that he had occasional mild back pain. In his deposition, Steven described his pain prior to the accident as “moderate to severe.” He further testified that prior to the accident he did not have left sided pain. However, the medical records |13of both Dr. Sketchier and Dr. Seltzer indicate that *161 Steven had pain radiating into his left pain prior to this accident. Additionally, at trial, Steven denied being a commercial shrimper while Dr. Seltzer’s records make several references to Steven’s back pain increasing during trawling season and Dr. Seltzer states in his deposition that Steven was a commercial shrimper.
Terry Mancuso testified that she experienced continuous pain prior to this accident and that after the accident, she experienced an increase in the severity of her pain. She testified that this increase in pain lasted until March 2002. However, Dr. Seltzer wrote in the office notes dated April 21, 1999 “level of pain rapidly approaching the way it was prior to this accident.”
In its reasons for judgment, the trial court stated that “the plaintiffs are not credible witnesses.” The rule of “falsus in uno falsus in omnibus” provides that if one element of a witness’ testimony is proved to be untrue, the entirety of that witness’ testimony may be rejected by the trier of fact. This doctrine does not require rejection of the witness’ total testimony. The weight to be given the remainder of the witness’ testimony is to be determined by the trier of fact, given the circumstances of each case. Anglin v. White, 572 So.2d 779 (La.App. 4th Cir.1990).
In Rosell v. ESCO, 549 So.2d 840, (La.1989), the Court stated:
It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneous— clearly wrong 113standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.
When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
[citations omitted]
In its reasons for judgment, the trial court stated that “the plaintiffs are not credible witnesses.” Our courts have *162 recognized that the reasons for the principles of appellate review are based on the trial court’s ability to evaluate the demean- or of live witnesses while the appellate court is at a disadvantage by reviewing this testimony from a cold record. Leal v. Dubois, 00-1285 (La.10/13/00), 769 So.2d 1182. The issue before the appellate court is not whether the judgment rendered was right or wrong, but whether the trial of fact’s conclusions were reasonable given the evidence presented. Touchard v. Slemco Elec. Foundation, 99-3577 (La.10/17/00), 769 So.2d 1200. Thus, when the trier of fact’s determinations are based on the credibility of witnesses, that finding can almost never be manifestly erroneous or clearly wrong. Id.
If this court had been the trier of fact, it may have concluded that the plaintiffs did suffer injuries that aggravated their preexisting conditions, however, the testimony of all the witnesses and the evidence submitted in this case provides a reasonable factual basis for the trial court’s finding that the plaintiffs were not injured in this accident. We do not find that the trial judge committed manifest [ 14error in finding that the plaintiffs were not injured in this accident. Accordingly, the judgment of the trial court is affirmed.

AFFIRMED.